IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DONTE LOVE, )
    Plaintiff, )
)
v. ) No. 3:05-CV-399
) (Phillips)
GUBMK CONSTRUCTORS, )
    Defendant. )

## MEMORANDUM AND ORDER

Plaintiff Donte Love has sued his former employer, GUBMK Constructors, alleging racial discrimination in employment because he was subjected to a hostile work environment, retaliation for reporting discriminatory behavior, and ultimately, termination for engaging in protected conduct, in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101, *et seq.* Defendant GUBMK has moved for summary judgment asserting that there are no genuine issues as to material facts, and that GUBMK is entitled to judgment as a matter of law on all of plaintiff's claims. For the reasons which follow, defendant's motion for summary judgment will be granted in part and denied in part.

## Factual Background

GUBMK provides plant outage, maintenance and modification support to the Tennessee Valley Authority (TVA) at a number of fossil and hydroelectric plants throughout a six state region. GUBMK was formed in 1991 for the exclusive purpose of performing

construction modifications and supplemental maintenance work for TVA at coal fired and hydroelectric generating stations and other facilities as designated by TVA. The work that GUBMK does for TVA consists of "managed task" work that GUBMK directs and controls, and "staff augmentation" work under which GUBMK employs the craft labor but assigns them to work under TVA's direction and control. GUBMK maintains a non-manual staff of approximately 50-100 full-time personnel at the various sites and employs between 500 and 2,500 craft personnel depending on the volume of work at a given time. The number of personnel fluctuates frequently and varies based on the work load at TVA.

Plaintiff Donte Love was originally hired in mid-2004 as a task managed journeyman painter at the Bull Run facility near Oak Ridge, Tennessee. Plaintiff and all of GUBMK's other craft employees were referred for work assignments by their local union in accordance with the terms of the applicable collective bargaining agreement, the Project Maintenance and Modification Agreement (PMMA).

Love complained that his supervisor, Cecil McCarty, was overheard by another employee, making a racial slur ("stupid nigger") about Love on March 24, 2005. When confronted by Love, McCarty apologized, saying, "I'm sorry. It was nothing you did. I shouldn't have said it.' Love acknowledged that McCarty's racial slur was not said to him and that he did not hear the racial slur. Love reported the incident to Joey Hunt, McCarty's supervisor. No further racial slurs were made by McCarty. When Love talked to Hunt on the evening of March 25, Hunt told Love that McCarty was the best general foreman they

had and he sure would hate to fire him. He asked Love if he would be satisfied if he wrote McCarty up and kept it in his file for one year.

On March 28, 2005, a meeting was held with Melvin Walker, the Shop Steward; Stan Walton, GUBMK's Coatings Manager; John Simonetto, GUBMK's Resource Manager, Hunt and Love to discuss the incident in an attempt to find an equitable solution. Love was told that GUBMK would investigate the matter and that he could file a grievance if he disagreed with the actions taken by GUBMK.

It was determined that McCarty, who had been with the company over five years and had no prior history of employee racial problems, would be given a written reprimand and that the reprimand would be permanently retained in his employee file. It was also decided that McCarty would be given a 3-day suspension without pay.

When Love attempted to file a grievance with his union over the matter, he was told by Melvin Walker that it was a long process and that if he filed the grievance, he would be considered a troublemaker and he would never get another job with GUBMK or the Union.

On April 4, 2005, the day McCarty returned to work after his suspension, Love was 38 minutes late for work. He had never been late for work before. That day, he received both a verbal and a written warning for tardiness. Love contends he had always

been on time and had always showed up for work. In the eleven months he worked for GUBMK, he never had any disciplinary actions. Don Peltz, another employee (white) who had been late the week before, was also written up that day. On May 17, another employee, Jason VanNordstrum (white) came in late and he did not receive a written warning. Several days later, other white employees, Tip Jr., Tip Sr. and Tracy Kilgore all came in late or did not show up for work, and they were not written up.

On April 28, 2005, Love received a second verbal and written warning for unsatisfactory performance for failing to follow company policy when the painters did not clean up the conex as McCarty had ordered. When Love told the painters to clean up, they responded that the conex was only cleaned up on Thursdays, and they left. Love was the only painter to clean up that day. The following day, McCarty wrote up all the painters, including Love, even though Love had done what he had been told to do.

On May 5, 2005, Love filed a charge with the EEOC alleging discrimination. On May 24, 2005, the EEOC issued a notice of right to sue. The instant lawsuit was filed on August 19, 2005.

On June 9, 2005, Love and three other employees were laid off. According to GUBMK, the selection process to determine which personnel would be laid off was done on a case by case basis based solely on project requirements and individual work criteria. GUBMK states that Love's lay-off was part of an overall reduction in personnel to adjust

staffing levels due to a change in work requirements and was made purely for economic reasons.

In addition to Love, Matthew Shawn Moore, Jeffrey Dotson and Don Peltz were laid off on June 9. Love and Dotson are African-American, Moore and Peltz are white. When plaintiff had his exit interview with Joey Hunt, McCarty and David Metler, Hunt informed him that, "they could do whatever they wanted to, and that after the incident of the racial remark, if everyone wants to go by the rules, they would go by them, remember that is when it started." On June 10, Love met with Simonetto, who advised him that Hunt and McCarty decided what skills were needed for the work remaining and they decided who were the best people for the work. Love informed Simonetto that he felt that Hunt and McCarty were discriminating and retaliating against him.

Later, when additional painting personnel were required, Dotson and Peltz were referred by the Union and rehired by GUBMK and are still working for GUBMK. Love and Moore were not referred to GUBMK by the Union when painters were requested by GUBMK. GUBMK states that if the Union had referred Love to GUBMK, he would have been rehired.

There is a specific process with the Union for placing an applicant with a union employer such as GUBMK. In order to be referred to any union employer, an applicant must put his name on a list indicating that he is out of work. This is called the

"referral list" or "out of work list." It is the responsibility of the applicant to place his name on the referral list within 48 hours of termination to be considered available for employment. To insure and maintain the accuracy of the referral list, all applicants must re-register every 30 days to retain a place on the list. Failure to contact the local union office every 30 days will result in an applicant's name being removed from the list until such time as that person re-registers on the referral list by appearing personally at the local union office. When an applicant re-registers after the 30-day period, his placement on the referral list is determined by the last date of registration. If the applicant does not place his name on the referral list, he will not be referred to GUBMK. GUBMK is a TVA PMMA employer and therefore must hire employees through the referral list as maintained by the Union. When GUBMK needs additional painters, the Union is contacted by GUBMK and the union representative refers painters to GUBMK from the referral list.

Love admits that when he was laid off on June 9, he did not put his name on the referral list immediately, but took some time off and drew unemployment. Love did not put his name on the referral list in September because he found a non-union job working with Cooper Drywall painting. Love went back to the Union in November to put his name on the referral list. Since that time, Love has been referred by the Union to other employers, but not to GUBMK.

GUBMK has moved for summary judgment asserting that (1) the undisputed evidence fails to establish a racially hostile work environment; (2) no retaliation occurred

as a result of Love reporting McCarty's racial slur; and (3) Love's selection for the reduction in force was made for legitimate, non-discriminatory reasons.

Plaintiff Donte Love has responded in opposition, stating that the evidence in this case demonstrates that he was subjected to a hostile work environment, and discriminatory terms and conditions of employment, thus precluding summary judgment in favor of GUBMK.

### **Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**Analysis**

GUBMK moves for summary judgment on the grounds that (1) the undisputed evidence does not establish a basis for Love's claim of a hostile work environment; (2) that the decision to include him in the reduction in force was based entirely on budget driven, legitimate business related non-discriminatory reasons that were justified and not pretextual; and (3) that his receiving verbal and written reprimands for unsatisfactory performance was not retaliatory.

Hostile Work Environment

Love asserts he was subjected to a hostile work environment during his employment at GUBMK. Title VII prohibits racial harassment that creates a hostile or abusive workplace.[1] *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993); *Newman v. Federal Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). Under Title VII, a plaintiff establishes a *prima facie* case of hostile work environment based on race by demonstrating the following five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3)

---

[1] Because the analysis of the THRA claim essentially tracks claims under Title VII, Love's THRA claims will be discussed in the context of his Title VII claims. *Patterson v. McLean Credit Union,* 491` U.S. 164, 185-88 (1989); *Hamilton v. City of Martin*, 129 F.3d 1264 (6th Cir. 1997); *Harper v. BP Exploration and Oil Co.,* 896 F.Supp. 743, 747 (N.D.Tenn. 1995); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 31 (Tenn. 1996).

the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer was liable for the harassment. *Hafford,* 183 F.3d at 512.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21. In determining whether there was a hostile work environment, courts look to the "totality of the circumstances." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* quoting *Harris,* 510 U.S. at 23. The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Newman,* 266 F.3d at 405, quoting *Faragher,* 524 U.S. at 788.

In the present case, Love complains that his supervisor, Cecil McCarty, was overheard making a racial slur ("stupid nigger") about him. Love did not hear McCarty make the remark. When confronted by Love, McCarty admitted making the racial slur and apologized. Love then went to Joey Hunt, McCarty's manager and informed him about the incident and that he was not satisfied with McCarty's apology.

GUBMK then initiated an investigation, and followed up with Love to assure him that McCarty understood the severity of his actions. McCarty was given a written reprimand which would be permanently retained in his employee file. In addition, McCarty was given a 3-day suspension without pay for the incident.

Evidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim under Title VII. *See, e.g., Stotts v. Memphis Fire Dept.,* 858 F.2d 289, 302 (6th Cir. 1988); *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380 (7th Cir. 1986); *Torres v. County of Oakland*, 758 F.2d 147, 152 (9th Cir. 1985); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981); *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971). Here, Love's proffered evidence fails to establish a *prima facie* case of a hostile work environment. As the Sixth Circuit stated in *Stotts:*

> Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the work place. An employer "is not charged by law with discharging all Archie Bunkers in its employ." *Howard v. National Cash*

> *Register Co.*, 388 F.Supp. 603, 606 (S.D.Ohio 1975). That would be an unrealistic burden.

*Stotts,* 858 F.2d at 302.

The record shows that GUBMK took immediate action to investigate the incident and to discipline McCarty, who received a written reprimand and a 3-day suspension without pay. The conduct about which Love complains was an isolated incident for which the defendant took prompt, remedial action. Under no interpretation of the evidence can it be concluded that GUBMK endorsed or permitted a racially hostile environment. Accordingly, GUBMK is entitled to summary judgment on Love's hostile environment claim.

Retaliation

Love has alleged retaliation by his supervisors following his complaint to GUBMK. First, he alleges that he received verbal and written warnings for being late and for failing to clean up the conex. Second, Love alleges that his selection for the RIF was in retaliation for reporting the racial slur made by McCarty.

To establish a *prima facie* case of retaliation under Title VII, Love must show that (1) he engaged in protected activity, (2) that GUBMK had knowledge of his exercise of protected rights, (3) he suffered an adverse employment action, and (4) a causal connection exists between his protected activity and the adverse employment action. *See,*

-11-

e.g., *Singfield v. Akron Metropolitan Housing Auth.,* 389 F.3d, 555, 563 (6th Cir. 2004); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001).

To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected activity. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's protected activity is relevant to causation. *Id.*

To establish a *prima facie* case of discriminatory discharge, Love must establish: (1) that he is in a protected class; (2) that he was discharged; (3) that he was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job. *Seay v. Tennessee Valley Auth.,* 339 F.3d 454, 463 (6th Cir. 2003). In a RIF case, the fourth element is modified and the plaintiff must submit "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 548 (6th Cir. 2004).

Love has established a *prima facie* claim of retaliation regarding the disciplinary actions taken against him, and his selection for the RIF. He engaged in protected activity when he made a complaint about his supervisor's racial slur; GUBMK had knowledge of his complaint; and he suffered adverse employment actions. Moreover, Love has shown a causal connection between his protected activities and the verbal and written reprimands. He received his first reprimand for being 38 minutes late on the day McCarty returned from his suspension. Several days later, other white employees, Tip Jr., Tip Sr., Tracy Kilgore and Jason VanNordstrum all came in late or did not show and they were not written up. Three weeks later, McCarty gave Love verbal and written warnings because the painters failed to clean up the conex area, even though Love had cleaned up his area, as directed. Another violation and Love could have been suspended and/or terminated pursuant to company policy. Love has presented a genuine question of fact whether these reprimands were motivated by his reporting of McCarty's racial slur. In addition, based on the evidence submitted, a reasonable jury could also find that Love was singled out for the RIF in retaliation for his claim of discrimination.

GUBMK has asserted a legitimate nondiscriminatory reason for Love's being selected for lay-off. On June 9, 2005, Love and three other employees were laid off as part of an overall reduction in personnel to adjust staffing levels due to a change in work requirements. GUBMK asserts the RIF was based on the needs of the project on which Love was working and was legitimate and nondiscriminatory. These reasons satisfy GUBMK's burden to produce nondiscriminatory reasons for its employment actions. Once

the employer makes such a showing, the burden then shifts back to Love to show that GUBMK's reasons are pretextual. To do so, Love is required to show either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decisions; or (3) that they were insufficient to motivate GUBMK's decision. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

When Love went to his exit interview, he testified he was told that due to economic conditions, there needed to be a RIF. However, Love states that three white workers transferred in to perform the work formerly done by the workers laid off. Moreover, Dotson and Peltz were recalled to GUBMK but Love was not, although his name was on the union referral list. Love was told by his supervisors that they could do whatever they wanted to, and that after the incident of the racial remark, if everyone wanted to go by the rules, they would go by them. It appears to the court that Love has raised a genuine question of fact whether his selection for the RIF was motivated by economic reasons or in retaliation for his claim of discrimination. Trials exist to resolve such questions of fact. Accordingly, defendant's motion for summary judgment as to Love's claim of retaliation will be denied.

**Conclusion**

For the reasons stated above, defendant GUBMK's motion for summary judgment [Doc. 25] is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as to Love's claim of discrimination based upon a hostile work environment; the motion is **DENIED** as to Love's claim of retaliation. The parties will prepare the case for trial.

**ENTER:**

s/ Thomas W. Phillips
United States District Judge